

BOGAN PUBLIC MANAGEMENT

# REPORT FOR
# CAMBRIDGE CAPITAL ADVISORS, LLC.

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

## FOR THE YEARS ENDING DECEMBER 31, 2015, 2016 and 2017

**Report Date February 15, 2019**



**Intentionally left blank.**

## Table of Contents

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON THE AUDIT OF INTERNAL CONTROL- ADVERSE OPINION ON INTERNAL CONTROL (PRE-AS-3101, AS AMENDED) .................................................................................................................................... 3

ORGANIZATIONAL CHART ....................................................................................................... 6

NATURE OF OPERATIONS ....................................................................................................... 11

CAMBRIDGE CAPITAL ADVISORS, LLC ................................................................................ 13

– GLOBAL  INVESTMENT ADVISORY TEAM .................................................................... 13

FINANCIAL STATEMENTS SECTION ...................................................................................... 18

NOTES SECTION ......................................................................................................................... 24

1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES ....................................... 25

2.    ASSETS ............................................................................................................................. 29

3.    LIABILITIES ...................................................................................................................... 31

4.    CONTINGENT LIABILITIES ......................................................................................... 33

5.    RELATED PARTY TRANSACTIONS .............................................................................. 35

6.    INVESTORS ...................................................................................................................... 36

7.    TRANSFERS IN/OUT ..................................................................................................... 37

8.    INTEREST EXPENSE ....................................................................................................... 37

9.    UNAUTHORIZED USE OF FUNDS .............................................................................. 38

10.    CAPITAL SHARE TRANSACTIONS ............................................................................. 38

11.    GOING CONCERN ........................................................................................................ 38

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON THE AUDIT OF INTERNAL CONTROL- ADVERSE OPINION ON INTERNAL CONTROL (PRE-AS-3101, AS AMENDED)

Separate Report on the Audit of Internal Control—Adverse Opinion on Internal Control (Pre-AS-3101, as Amended)

To the Board of Directors and Stockholders of Cambridge Capital Partners, Cambridge Equity Options, and Cambridge Advisors.

## Adverse Opinion on Internal Control over Financial Reporting

We have audited the Cambridge Capital Advisors, (Entities) internal control over financial reporting as of December 31, 2015, December 31, 2016 and December 31, 2017, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Entities' management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting.

Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit. We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that

1.  pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

2.  provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and,

3.  provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are

subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

The following material weaknesses have been identified and included in management's assessment:

1. Control Objective – Maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the Entities.

   There were no monthly reconciliations of subsidiary G/L accounts to control accounts, timely completion of accurate and complete monthly bank account reconciliations, or issuance of monthly reports to management.

   Additionally, there was no consistent management oversight of transactions, the accounting processes, or accounting records.

   Consequently, there is a reasonable possibility that a material misstatement of the Entities' financial statements will not be prevented or detected and corrected on a timely basis.

2. Control Objective – Transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Entities are being made only in accordance with authorizations of management and the Board of Directors.

Segregation of Functions (Duties) is a fundamental element of internal control. It requires the segregation between employees of the performance of certain key duties. The underlying concept is that no employee should be in position to both perpetrate and to conceal errors or fraud in the normal course of their duties.

There was no Segregation of Functions in the processes for the authorization, execution, recording, or reconciliation of transactions.

Additionally, there was no consistent management oversight of transactions, including authorization of transactions, or the accounting processes.

Consequently, there is a reasonable possibility that a material misstatement of the Entities' financial statements will not be prevented or detected and corrected on a timely basis.

These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the December 31, 2015, 2016, and 2017 financial statements, and this report does not affect the financial report issued February 15, 2019.

The fact that we were unable to apply other procedures to obtain sufficient evidence about the effectiveness of the company's internal control over financial reporting, the scope of our work was not sufficient to enable us to express, and we do not express, an opinion on Cambridge Capital Advisor's internal control over financial reporting. We have communicated with management in a separate letter, the details of the issues regarding internal controls and the associated recommendations to address these weaknesses. After the commencement of the audit, it was determined that management had not exercised proper internal controls over its financial records. Cambridge originally did not properly maintain their books. Management subsequently obtained the services of an accountant to reconstruct their books. Financial transactions related to external parties have been addressed and are properly reflected.

In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, the Entities have not maintained effective internal control over financial reporting as of December 31, 2015, 2016, and 2017, based on criteria established in Internal e-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the balance sheets and the related statements of income, comprehensive income, stockholders' equity, cash flows and our report dated February 15, 2019 disclaimer of opinion.

*Bill Bogan*

Bill Bogan, Jr. CPA, CGFO, CPFO
Bogan Public Management
Tallahassee, Florida

**ORGANIZATIONAL CHART**

CAMBRIDGE CAPITAL GROUP LLC

Officers January 1, 2016 – March 8, 2017 Florida
|
Phillip Timothy Howard
President
|
Don Warner Reinhard
Consultant functioning in the capacity of Executive Vice President
December 4, 2015 – February 13, 2017
|
Mark Hallim
Vice President


CAMBRIDGE CAPITAL GROUP LLC
Officers March 8, 2017 – May 3, 2017 Florida
|
Lois Koons
President
|
Gail Milon
Vice President
|
Mark Hallim
Treasurer


CAMBRIDGE CAPITAL GROUP LLC
Officers April 10, 2017 – Apr 30, 2018 Nevada
|
Lois Koons
Manager
|
Gail Milon
Manager


CAMBRIDGE CAPITAL GROUP LLC
Officers May 1, 2018 – Present
Nevada
|
Gail Milon
Manager

CAMBRIDGE CAPITAL PARTNERS LIMITED PARTNERSHIP
Officers December 27, 2015 – May 25, 2017
Massachusetts
|
Cambridge Capital Advisors LLC
General Partner
|
Phillip T Howard
General Partner
|
Don Warner Reinhard
Consultant functioning in the capacity of Executive Vice President
December 27, 2015 – February 13, 2017


CAMBRIDGE CAPITAL PARTNERS WEALTH FUND LLC
Officers May 1, 2017 – Present
Nevada
|
Gail Milon
Manager
|
Cambridge Capital Partners LP merged with Cambridge Capital Group Equity Option Opportunities
LP to form Cambridge Capital Partners Wealth Fund LLC May 1, 2017


CAMBRIDGE CAPITAL GROUP EQUITY OPTION OPPORTUNITIES LP
Officers December 16, 2015 – December 7, 2017
Massachusetts
|
Phillip T Howard
Resident Agent
|
Cambridge Capital Advisors LLC
General Partner
|
Don Warner Reinhard
Consultant functioning in the capacity of Executive Vice President
December 16, 2015 – February 13, 2017
|
Cambridge Capital Group Equity Option Opportunities LP merged with Cambridge Capital Partners
LP to form Cambridge Capital Partners Wealth Fund LLC May 1, 2017

CAMBRIDGE CAPITAL ADVISORS LLC
Officers March 5, 2015 – March 7, 2017
Florida
|
Phillip T Howard
President
|
Don Warner Reinhard
Consultant functioning in the capacity of Executive Vice President
March 5, 2015 – February 13, 2017
|
Mark Hallim
Vice President
|
Ankur Mehta
Treasurer


CAMBRIDGE CAPITAL ADVISORS LLC
Officers March 8, 2017 – May 3, 2017
Florida
|
Lois Koons
President
|
Gail Milon
Vice President
|
Mark Hallim
Treasurer


CAMBRIDGE CAPITAL GROUP ADVISORS LLC
Officers June 28, 2017 – February 22, 2018
Nevada
|
Lois Koons
Member
|
Addys Walker
Member
|
Jeff Kahn
Member

CAMBRIDGE CAPITAL GROUP ADVISORS LLC
Officers February 23, 2018 - May 3, 2018
Nevada
|
Lois Koons
Member
|
Gail Milon
Member

CAMBRIDGE CAPITAL GROUP ADVISORS LLC
Officers May 3, 2018 – Present
Nevada
|
Gail Milon
Member

## NATURE OF OPERATIONS

### Background

Cambridge Capital Group, LLC, ("Cambridge" or "CCG") and its affiliate companies, were created in 2015 as an applied project for Cambridge Graduate University International ("CGUI") faculty and graduate students. Cambridge Capital Group ("CCG") and its affiliate companies, as created, designed and implemented by the consultant, Mr. Don Reinhard, were originally incorporated in Massachusetts. All companies have since been transferred to active companies in Nevada.

### Investment Goals

Based on the plan and guidance of the consultant, the Fund goals were to generate capital gains and interest income primarily from investment and trading in mortgage backed securities ("MBS") and derivatives, asset backed securities ("ABS") and derivatives, US and International private and public debt securities ("USI") and derivatives, and litigation settlement claims ("LS"). The Fund may also invest in and trade in other securities, derivatives and financial contracts, both for hedging and for speculative purposes. The Investment may also allocate up to 25% of the Fund's net assets (determined at the time of investment) to other investment managers, including investment managers that may be affiliated with the Investment Manager. The fund ultimately invested in LS, real estate, and a technology start up.

The General Partner has, subject to delegation, sole responsibility for management of the Fund's business and investments. The General Partner, who is also the Investment Manager will manage the Fund's investment portfolio on a discretionary basis. The Investment Manager is registered as an exempt investment advisor with the Securities and Exchange Commission under the Advisors Act Section 203(m), as amended.

### Notice of Express Waiver of Conflict and Liability

To address the risk of potential conflicts of interest and waiver of liability for any legal client of Howard & Associates, P.A., and Mr. Tim Howard, that may consider investing with CCG, a comprehensive Notice of Express Waiver of Conflict and Liability was also prepared in October of 2015, as no investment advice or recommendation was provided by Mr. Tim Howard or his law firm.

### Consultant Dismissal and Associated Financial Issues

Cambridge relied upon a consultant that had prior experience in managing a hedge fund. The consultant was dismissed in February of 2017 for unrelated criminal charges. Since that time, CCG has uncovered significant issues that it was not aware of prior to his departure. The associated financial issues are discussed in this narrative.

### Corporate Filings

Cambridge Capital Partners Wealth Fund LLC (the "Fund") is a Nevada limited liability company investment fund that originated as Cambridge Capital Partners L.P. (the "Fund") and Cambridge Capital Group Equity Options Opportunities L.P. (the "Fund"), two separate investment funds merged into one. Both Funds were Massachusetts limited partnership investment funds organized in Florida in February 2015 and December 2015 respectively. The General Partner of the Fund (the "General Partner") is Cambridge Capital Group Advisors, LLC, a Nevada limited liability company that originated as Cambridge Capital Advisors, LLC, a Florida limited liability company organized in February 2015. The Investment Manager of the Fund (the "Investment Manager") is Cambridge Capital Group Advisors, LLC, a Nevada limited liability company that was initially organized in February 2015.

**Global Investment Advisory Team**

Hugh Crossland, J.D., LL.M., LP.D., was the Chairman from November of 2015 through mid-2016 of the Global Investment Advisory Committee ("GIAT"). CCG partnered with Crossland and Crossland of Boston, MA, a law firm with experience in investing and investments. The senior partner of the law firm was ultimately Chairman of the GIAT. Dr. Hugh Crossland, LL.M., J.D., Ph.D. was designated Chairman due to his expertise in finance, tax, accounting and investing garnered and nurtured in over 40 years in many of the financial services planned to be developed and offered by CCG.

## CAMBRIDGE CAPITAL ADVISORS, LLC
## – GLOBAL  INVESTMENT ADVISORY TEAM

**Mark Hallim, CTP, Chairman** – Mr. Hallim spent 21 years associated with investment banking firms Salomon Smith Barney and Citigroup Global Markets. Through his responsibilities involving domestic and global credit exposure and liquidity, corporate finance, international cash management systems and global shipping and logistics, Mr. Hallim has developed and cultivated numerous contacts in corporate finance, international banking and global capital markets. Mr. Hallim joined The Gerson Lehrman Group in 2006 and advises clients on business development, corporate finance, cash management, sales and marketing strategies.

**Dale Weeks** – Mr. Weeks brings extensive global public sector and select Fortune 500 private sector expertise in both high tech and service industries. During his 21year career in the private sector, Mr. Weeks designed, directed, and implemented major financial and management information systems for Xerox Corporation, General Mills, and Control Data Corporation. Before entering the public sector with both the Minnesota Department of Revenue and the Florida Department of Revenue, Mr. Weeks advised major international companies such as 3M and IBM as well as select public sector agencies with The Forsythe Group. Currently, Mr. Weeks is President of Global Leadership and Benchmarking Associates with a strategic focus on performance operational management challenges.

**Dr. Goran Ridic, LP.D.** – As an Assistant Professor in Economics and Finance for the Sarajevo School of Science & Technology, Dr. Ridic offers a wealth of experience garnered from his work in the private sector as a financial analyst for Pratt & Whitney and a quantitative analyst with The Hartford  Financial Services       Group and Investment    Management   Company where  he conducted fundamental research in Government and Agency Debt, TIPS and MBS securities and derivatives, CMO structures, and capital structure arbitrage. Additionally, Dr. Ridic worked extensively in researching and developing applied models to assess risk and return for derivatives, collateral, and counterparty risk while developing a vast array of influential investment contacts.

**Dr. Carlos Ponce, LL.M., LP.D.** – Dr. Ponce is a renowned leader in the fields of environmental planning, civil society and social development, regulatory, human rights and democracy empowerment throughout Latin America and the Caribbean. His leadership and experience in designing and managing quick-impact, small grants for donor - funded programs for USG, USAID, OTI, IAF, NED, European Union, Taiwan Foundation for Democracy, Canada's DFAIT, World Bank, and IAF has given him a diverse global network of prominent business and  public  leaders.  Dr. Ponce is a permanent resident of Venezuela.

**Dr. Ben Tafoya, LP.D.** – Dr. Tafoya began an academic career in the fields of macroeconomics, microeconomics, public policy and political theory at New England College after a distinguished business career stretching over 25 years in management, operations, sales and marketing with firms in the hardware and software technology industry. He brings a vast array of knowledge to the Investment Advisory Team from his active roles as a COO and National Sales Director in this dynamic fast paced business environment.

**Dr. Leonard Buckle, Ph.D., & Dr. Suzann Buckle, Ph.D.** – The Buckles collectively bring an extensive background in Urban Planning and Public Policy having spent the bulk of their respective careers at

Harvard University, Massachusetts Institute of Technology and Northeastern University in Boston. With undergraduate degrees in Industrial Management and Electrical Engineering and Ph. D.s in Urban and Regional Planning from M.I.T., the Buckles offer a wealth of analytical and applied experience in institutional development strategies, urban growth and planning and the vast investment opportunities that exist.

**Dr. Elda Sinani, LL.M., LP.D.** – Formerly a Prosecutor in Albania, Dr. Sinani brings a rich global experience in public service, academia and government administration and policy. With a law degree from the Law School in Albania, she holds a Master of Law with a Certificate of Specialization in International Human Rights from University of Connecticut School of Law, and a Doctorate of Law and Policy from Northeastern University. Dr. Sinani's research, publishing, teaching, and leadership focuses on the areas of human rights, immigrant and refugee rights, state institutions, security regimes, social movements, globalization, and democratic transitions in the Eastern European countries. Her career has given her not only the opportunity to recognize and understand vast global capital opportunities but also build an impressive network of international contacts.

**Dr. Naim Syed, LP.D.** – As Vice President of Technology, and Central Asia/Middle East Graduate Programs, for Cambridge Graduate University International, LLC, Dr. Syed brings tremendous applied experience in technology application to the rapidly expanding field of global online learning and education. He is responsible for the design, development and implementation of organizational information systems, software applications, and IT support and infrastructure systems, as well as the MBA, MIB and Masters in Global Studies programs in Central Asia and the Middle East, including Dubai. His leadership position also keeps him on the cutting edge of emerging information technologies that must be analyzed, assimilated and integrated for successful application in the global academic arena where delivery is critical, as well as grounded insights into the markets and competitive advantages of Central Asia and the Middle East. Dr. Syed has held similar positions at the State of Massachusetts, Concord NH Department of Education and Manchester Community College. Dr. Syed received a Bachelor's degree in Engineering in 1983 and a MBA in 2003. He received his LP.D. from Northeastern University with research on "The Role of Technology in Education" in 2009.

**Dr. Eric Kupferberg, Ph.D. -** With past appointments to Massachusetts Institute of Technology, Harvard University, Harvard Medical School, Northeastern University and currently Cambridge Graduate University International as Vice President & Director of India Programs, Dr. Kupferberg brings extensive understanding, knowledge and experience in the opportunities of the emerging market economy of India. He has created partnership programs with Indian universities in the fields of business and biomedical while also being instrumental in identifying gaps in knowledge among new and emerging leaders in Indian industry and governmental agencies.

**Dr. Edwardo D'Andre Williams, M.D. –** Dr. Williams received his degree in Pharmacy in 1978 from Florida A & M University and his Medical degree from the University of Florida in 1984. He performed his Residency Program at the Duke Area Health Education Center in Fayetteville, North Carolina and currently is Associate Medical Director and a Primary Care Physician at the Neighborhood Medical Center, Tallahassee, Florida. Dr. Williams is responsible for all clinical operations of the facility and therefore, remains well aware of the vast changes currently being experienced in the healthcare industry and the delivery of quality comprehensive, efficient and affordable healthcare.

**Dr. Patrick Preston, LP.D.** - With a Doctorate degree in Law & Policy with a focus on the future entertainment industry from Northeastern University as well as Screenwriting courses from the University of California, Dr. Preston is well versed in all aspects of the dynamic entertainment management industry from law & ethics, film & TV production, sales & marketing, delivery & distribution, as well as the ever-changing business environment. Not only has Dr. Preston taught numerous courses in the entertainment management industry but he has also produced films and written multiple screenplays & pilots.  He is the Department Chair for Entertainment Management for Bay State College in Boston, Massachusetts.

**Dr. Francis Maltiby, LP.D.** – As President & CEO of Dependable Community Living Corporation, as well as President of the Community Bank in Ghana, Dr. Maltiby brings proven leadership skills and expertise in small business development, operations and finance, developing and executing strategic plans and globalization. Her past position of CEO of Akurugu's Enterprises in Ghana as well as various consulting projects also in Ghana has afforded Dr. Maltiby a network of national leaders in Ghana as well as an in-depth understanding of the needs and opportunities of the emerging market economies of West Africa.

 **Dr. Thomas A. Lynch, Ph.D.** – Dr. Lynch brings an extraordinary volume of experience, judgment, insights and influential contacts from his current position as Director Emeritus for the Center for Economic Forecasting and Analysis (CEFA) at Florida State University, and as former Chief Environmental Economist for the State of Florida, and former Chief Health Care Economist for the State of Florida. At CEFA, Dr. Lynch conducts economic analysis in a wide range of areas including health care, environmental and energy, transportation, growth management, land use and real estate development. With a Bachelor of Science, Master of Science and Ph.D. from Florida State University, Dr. Lynch has also held the prestigious positions of Assistant Director of the high-profile Florida High Speed Rail Transportation Commission.

**Dr. J. David Golub, J.D., Ph.D., LP.D.** – With multiple academic credentials in accounting and economics with an M.B.A. and Ph.D., from University of Chicago, real estate and international business with a Real Estate degree from New York University, additional post graduate/doctoral work in law, taxation, corporate finance and financial planning from Georgetown University Law Center and Brooklyn Law School, and a doctorate degree in law and policy (LP.D.) from Northeastern University, Dr. Golub brings a tremendous understanding of the intimate intertwining of economics, finance, law and taxation. This combination garnered over 45 years while  working with some of Wall Street's most powerful tax and legal advisors has afforded him the ability to develop the art of identifying keen opportunities and the importance of the details.

**Dr. Christopher Zambakari,  LP.D.** – With an MBA in Finance from the European School of Economics and a Master in International Studies from Australia, Dr. Zambakari brings a wealth of global business initiatives with on the ground work in Germany, UK and South Africa.   His current professional responsibilities include supporting the major thematic issues such as federalism, resource-sharing, local governance and decentralization, and consensus building for continuing multi-stakeholder dialogues with the major social and political leaders in the Middle East and North Africa.

**Pinku Biswas** – Located in New Delhi, India and an expert on the economic markets and investment opportunities in India and Central Asia, Mr. Biswas brings more than seventeen years of experience in the field of International Higher Education & Recruitment with specialization in policies and strategies for education, planning & implementation, collaborations & research, management education, vocational education, distance learning, academic tie-ups, marketing & promotion, and research and consultancy. Mr.

Biswas is a specialist in (1) Marketing and promotion of International Higher Education, Overseas Student Recruitment (Universities / colleges / boarding schools), Academic Tie-ups, Recruitment campaigns & Education Fairs, Exchange programs; (2) conception and implementation of all dimensions of education program including policy, strategy, advocacy and work planning; (3) Business Development, Product Development, Project Management, Strategic Partnerships, International Liaison; (4) International Liaison & Coordination; and (5) Media, PR & TV/Film Production. Aside from being the Founder, Owner and Director of Admissions in TALIEM, an International Liaison Office of European Universities; Pinku Biswas is also an active member of the Advisory Panel  of the Central Board of Film Certification (Censer Board), Advisor on International Affairs & Accreditation, Senior Vice President & Advisor – International Affairs under the Sulabh International Social Service Organization, a member of the Academic Advisory/Managing Board, and a Roving Correspondent for the Northern India Patrika.

**Harrison Smith, Jr**. Mr. Smith brings his knowledge/experience in mortgage banking, mortgage investing and financing, having been a mortgage banker for SunTrust Bank, Wells Fargo, and All Mortgage, Inc.  Mr. Smith also specializes in sports management, athletic careers and placement, as well as sports apparel.

**Fedja Krivosic –** Mr. Krivosic is founder and principle of Tvrtko Capital, an alternative investment fund focused on probability futures strategies. As a quantitative trader at Wall Street investment houses Jeffries & Company, Goldman Sachs, and Morgan Stanley Mr. Krivosic has extensive knowledge and experience in designing, implementing, and application of Algorithmic Trading as well as other Electronic Trading services and platforms. With a Master degree and additional studies at Oxford School of Languages, Center for European Studies in Maastricht Holland, and the International University in Kuala Lumpur, Malaysia, Fedja also worked with the Soros Foundation in New York on the Invisible University project in Burma. Currently residing in Sarajevo in Bosnia, Mr. Krivosic provides a valuable insight into unique debt and equity investment opportunities in developing countries such as Bosnia, Ghana, Morocco, and Mozambique as well as many others.

**Dr. Maria Teresa Romero, Ph.D. –** Dr. Romeo brings a wealth of knowledge and contacts from Latin America with an extensive focus on Venezuela foreign politics. As a full professor for 25 years at the School for International Studies, Central University of Venezuela she offers extensive insight to vast niche opportunities in Latin America. Currently, she also leads the popular television show "Agenda Global" on El Venezolano TV.

**Elton G. Patterson –** Mr. Patterson spent 4 years as a Defensive End in the NFL before becoming the founder of a highly successful real estate investment firm. E & P Real Estate Investor, Inc. has developed a unique ability to not only identify potential investment opportunities but also develop and implement creative solutions to financing, marketing, and determining value. His meticulous approach to understanding the details of complex development strategies will provide valuable insight to niche global investment projects.

**Thomas C. Woods –** Currently Vice President of Business Development and Compliance for Cambridge Graduate University International, Mr. Woods previously spent over 25 years as a highly successful sales professional in IT, technology, and business development. As an executive with DELL Corporation with the responsibility for the vast Florida government business sector, Tom's ability to understand strategic initiatives and building synergies through a team leadership approach will prove valuable to the global goals

of CCG and its core philosophy of leveraging the applied "Praxis" model of entrepreneurial leadership which is the founding base of Cambridge Graduate University International.

**Kay Eubanks** – After 35 years of a distinguished real estate and development career in and around Florida's capital city where she attained the pinnacle of success by being named #1 in Florida for Coldwell Banker Real Estate as well as #1 in the Southeast United States, Ms. Eubanks went to a relatively unknown locale in Northwest Florida (the Forgotten Coast) and founded a new Real Estate Development Company. Due to her unique and creative ability to not only see vision but also strategically implement the requirement planning, execution, and sales, the rest of Ms. Eubanks career defined the record books. It's these qualities and her vast operational project knowledge and advice that she brings to the table in helping identify unique and undeveloped global investment opportunities.

**FINANCIAL STATEMENTS SECTION**

**Cambridge Capital Advisors  LLC**
**Statement of Assets, Liabilities and Members' Equity**
**December 31, 2015, 2016 and 2017**
**Reissued**

| ASSETS | | 2015 | | 2016 | | 2017 |
|---|---|---|---|---|---|---|
| | **Cash and Cash Equivalents** | $ 118,217 | $ | 28,918 | $ | 2,555 |
| | **Accrued Interest Income** | - | | 15,054 | | 83,996 |
| | **Investment in Securities** | 24,972 | | 1,066,937 | | 2,760,349 |
| | **Investment in Land** | - | | - | | 21,500 |
| | **Net Fixed Assets** | | | 38,461 | | 29,411 |
| **Total Assets** | | $ 143,189 | $ | 1,149,370 | $ | 2,897,811 |

| LIABILITIES AND MEMBERS' EQUITY | | 2015 | | 2016 | | 2017 |
|---|---|---|---|---|---|---|
| | **Other Liabilities** | - | | - | | 1,444,646 |
| | **Total Liabilities** | $ - | $ | - | $ | 1,444,646 |
| | **Members' Equity** | 261,397 | | 1,259,645 | | 1,927,147 |
| | **Net Increase (Decrease) in Net Asets** | (118,208) | | (110,275) | | (473,982) |
| | **Total Liabilities and Members' Equity** | $ 143,189 | $ | 1,149,370 | $ | 2,897,811 |

**Please see the accompanying notes to the financial statements**

19

**Condensed Schedules of Investments in Securities**
**December 31, 2015, 2016 and 2017**

| Security Description (100% of Members' Equity) | 2015 | 2016 | 2017 | Fair Value |
|---|---|---|---|---|
| Investments in Advances/Promissory Notes/Loans | | | | Percentage of Investments |
| | | | | |
| Advances/Promissory Notes/Loans | 24,972 | 1,066,937 | 2,760,349 | 99% |
| Investment in Land | - | - | 21,500 | 1% |
| | $ 24,972 | $ 1,066,937 | $ 2,781,849 | 100% |

As of December 31, all of  Cambridge Capital Partners Investments are in these instruments.

**Please see the accompanying notes to the financial statements**

**Statement of Operations**
**December 31, 2015, 2016 and 2017**

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| **Investment Income** | | | |
| **Dividends** | - | - | - |
| **Interest** | - | 19,088 | 71,116 |
| **Total Investment Income** | $ - | $ 19,088 | $ 71,116 |
| | | | |
| **Investment Expenses** | | | |
| Investment Advisory Fees | - | - | - |
| Investment Broker Fees | - | - | - |
| Realized Loss on Investments in TD Ameritrade | 104,388 | | |
| Market Value Loss in Securities in TD Ameritrade | 8,729 | | |
| Interest Expense | - | - | 142,199 |
| Other  Expenses | 5,091 | 121,203 | 402,899 |
| **Total Investment Expenses** | 118,208 | 121,203 | 545,098 |
| | | | |
| **Net Investment Income (Loss)** | (118,208) | (102,115) | (473,982) |
| | | | |
| **Realized and Unrealized Gain (Loss) on Investments** | | | |
| Net Realized Gain (Loss) on Investments | - | - | - |
| Net Unrealized Gain (Loss) on Investments | - | - | - |
| **Total Realized and Unrealized Gain (Loss) on Investments** | - | - | - |
| | | | |
| **Net Increase (Decrease) In Net Assets Resulting from Operations** | $ (118,208) | $ (102,115) | $ (473,982) |

**Please see the accompanying notes to the financial statements**

**Cambridge Capital Advisors LLC**
**Statement of Cash Flows**
**January through December 2015, 2016, 2017**

| | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 |
|---|---|---|---|
| **Jan - Dec 15** | | | |
| **OPERATING ACTIVITIES** | | | |
| **Net Income** | (118,208) | (106,248) | (473,982) |
| **Adjustments to Reconcile Net Income** | | | |
| **to Net Cash Provided by Operations:** | (24,500) | (572,123) | (416,166) |
| **Net Cash provided by Operating Activities** | (142,708) | (678,371) | (890,148) |
| | | | |
| **INVESTING ACTIVITIES** | | | |
| | | | |
| **Net Cash Provided by Investing Activities** | (472) | (467,051) | (540,837) |
| | | | |
| **FINANCING ACTIVITIES** | | | |
| | | | |
| **Net Cash Provided by Financing Activities** | 261,397 | 1,056,123 | 1,404,622 |
| | | | |
| **Net Cash Increase/(Decrease) for Period** | 118,217 | (89,299) | (26,363) |
| **Cash at Beginning of Period** | - | 118,217 | 28,918 |
| **Cash at End of Period** | 118,217 | 28,918 | 2,555 |

**Please see the accompanying notes to the financial statements**

Cambridge Capital Advisors LLC
Statements of Changes In Nets Assets
For the Years Then Ended December 31, 2015, 2016  and 2017

| | | |
|---|---|---|
| **Beginning Balance-January 1, 2015** | $ | - |
| | | |
| **Member Subscriptions** | | 261,397 |
| **Member Redempition** | | - |
| **Net decrease in assets resulting from Operations** | | (118,208) |
| | | |
| **Balance December 31, 2015** | $ | 143,189 |
| | | |
| **Member Subscriptions** | | 1,108,296 |
| **Member Redempition** | | - |
| **Net increase/(decrease) in assets resulting from Operations** | | (102,115) |
| **Net increase in assets resulting from Operations** | | 1,006,181 |
| | | |
| **Balance December 31, 2016** | | 1,149,370 |
| | | |
| **Member Subscriptions** | | 1,251,759 |
| **Member Redempition** | | - |
| **Net increase/(decrease) in assets resulting from Operations** | | (473,982) |
| **Net increase in assets resulting from Operations** | | 777,777 |
| | | |
| **Balance December 31, 2017** | | 1,927,147 |

**Please see the accompanying notes to the financial statements**

**NOTES SECTION**

# 1.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The financial statements are expressed in United States dollars and have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP") as detailed in the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification. The Fund is an investment company for which reporting guidance can be found in FASB Topic 946.

**Principles of Consolidation**

The Fund consolidates entities that are not variable interest entities (VIEs) when it has a controlling financial interest as a result of majority voting control is not required to measure the entities at fair value in accordance with Topic 946. The Fund has consolidated the accounts of its wholly owned and controlled subsidiary, Cambridge Capital Partners and Cambridge Capital Group Equity Options Opportunities, which is not a VIE. Cambridge Capital Partners and Cambridge Capital Group Equity Options Opportunities are both investment companies wholly owned by the Fund, established for the general purpose of executing specific investment transactions on behalf of the Fund.  All significant intercompany accounts and transactions would have been eliminated if consolidated financial statements had been prepared, however because management has selected to prepare individual company financial statements only a schedule summarizing the transfer of funds is provided in the notes.

Also, the Fund consolidates variable interest entities for which it is the primary beneficiary, generally as a result of having the power to make the decisions that most significantly affect each entity's economic performance and holding a variable interest that obligates the Fund to absorb losses that could potentially be significant to each entity and/or entitles the Fund to receive benefits that could potentially be significant to each entity, when it is not required to measure the entities at fair value in accordance with Topic 946.  Currently, the Fund does not hold variable interests in any VIEs and consequently it is not required to measure at fair value in accordance with Topic 946.

**Use of Estimates**

The preparation of financial statements in conformity with GAAP requires the Fund's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates and such differences could be material.

**Cash and Cash Equivalents**

Cash represents cash deposits held at financial institutions. Cash equivalents include short-term highly liquid investments of sufficient credit quality that are readily convertible to known amounts of cash and have original maturities of three months or less. Cash equivalents are carried at cost, plus accrued interest, which approximates fair value. Cash equivalents are held for meeting short- term liquidity requirements, rather than for investment purposes. Cash and cash equivalents are held at major financial institutions and are subject to credit risk to the extent those balances exceed applicable FDIC or SIPC limitations.

**Investments**

**Valuation of Investments in Cambridge Capital Advisors, LLC.**

Investment transactions are accounted for on a trade-date basis. Realized gains and losses on investment transactions are determined using cost calculated on an average cost basis. Dividends are recorded on the ex-dividend date, and interest is recognized on an accrual basis. Distributions that represent returns of capital in excess of cumulative profits and losses are credited to investment cost rather than investment income. Discounts and premiums to the face amount of debt securities are accredited and amortized using the effective interest rate method over the lives of the respective debt securities. Discounts to the face amount of debt securities are not accredited and amortized to the extent that interest income is not expected to be realized. Withholding taxes on foreign dividends have been provided for in accordance with the Fund's understanding of the applicable country's tax rules and rates.

**Fair Value – Hierarchy of Fair Value Inputs**

The Fund records its investments in the Master Fund at fair value. Valuation of investments held by the Master Fund, including but not limited to the valuation techniques used, categorization within the fair value hierarchy of investments and risks, are discussed in the notes to the Master Fund financial statements included elsewhere in this report. The performance of the Fund is directly affected by the performance of the Master Fund.

The Fund carries its investments at fair value. Fair value is an estimate of the exit price, representing the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants (i.e., the exit price at the measurement date). Fair value measurements are not adjusted for transaction costs. A fair value hierarchy provides for prioritizing inputs to valuation techniques used to measure fair value into three levels:

> Level 1. Unadjusted quoted prices in active markets for identical assets or liabilities.

> Level 2. Inputs other than quoted market prices that are observable, either directly or indirectly, and reasonably available. Observable inputs reflect the assumptions market participants would use in pricing the asset or liability and are developed based on market data obtained from sources independent of the Master Fund.

> Level 3. Unobservable inputs. Unobservable inputs reflect the assumptions that the [General Partner, Managing Member, Investment Manager] develops based on available information about what market participants would use in valuing the asset or liability.

An asset or liability's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Availability of observable inputs can vary and is affected by a variety of factors. The [General Partner, Managing Member, Investment

Manager] uses judgment in determining fair value of assets and liabilities and Level 3 assets and liabilities involve greater judgment than Level 1 or Level 2 assets or liabilities.

Investments in private investment companies measured using net asset value as a practical expedient are not categorized within the fair value hierarchy. The availability of valuation techniques and observable inputs can vary from investment to investment and are affected by a wide variety of factors, including the type of investment, whether the investment is new and not yet established in the marketplace, the liquidity of markets, and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, determining fair value requires more judgment. Because of the inherent uncertainty of valuation, estimated values may be materially higher or lower than the values that would have been used had a ready market for the investments existed. Accordingly, the degree of judgment exercised by the Fund in determining fair value is greatest for investments categorized in Level 3.

For positions that are not traded in active markets or are subject to transfer restrictions, valuation inputs include the impact of such illiquidity and/or non-transferability.  Such adjustments are generally based on available market information.  In the absence of such evidence, management's best estimate is used.

**Fair Value – Valuation Techniques and Inputs**

When determining fair value, the Fund uses valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs.  The valuation techniques used by the Fund to determine fair value are consistent with the market or income approaches.

The market approach includes valuation techniques that use prices and other relevant information generated by market transactions involving identical or comparable assets, liabilities, or a group of assets and liabilities.  The Fund generally uses the market approach to value exchange-traded securities and exchange-traded derivatives.

**Marketable Equity Securities**

The Fund values equity securities that are traded on a national securities exchange at their last reported sales price.  The Fund generally values equity securities traded in the over-the-counter (OTC) markets and listed securities for which no sale was reported on that date at the price within the bid-ask spread that best represents fair value; [their last reported bid price if held long, and last reported ask price if sold short].

To the extent that equity securities are actively traded, and valuation adjustments are not applied, they are categorized in Level 1 of the fair value hierarchy. Equity securities traded on inactive markets or valued by reference to similar instruments are generally categorized in Level 2 of the fair value hierarchy.

**Fair Value of Financial Instruments**

The fair value of Fund financial instruments are carried at cost, including promissory notes and advances approximates the carrying amounts presented in the statement of assets and liabilities, due to the short-term nature of these instruments.

**Investment Income and Expenses**

The Fund records its proportionate share of the master Fund's income, expenses, and realized gains and losses.  In addition, the Fund incurs and accrues its own expenses.

**Income Taxes**

Under the laws of the United States of America the Fund is generally not subject to income taxes. However, certain dividend income and interest income may be subject to a maximum 30% withholding tax.  Further, certain non-United States dividend income may be subject to a tax at prevailing treaty or standard withholding rates with the applicable country or local jurisdiction. The Fund is subject to income tax examinations by major taxing authorities for all tax years since its inception.

The Fund is required to determine whether its tax positions are more likely than not to be sustained upon examination by the applicable taxing authority, based on the technical merits of the position. The tax benefits recognized is measured as the largest amount of benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authorities.  Based on its analysis, the Fund has determined that it has not incurred any liability for unrecognized tax benefits as of December 31, 2017.  The Fund does not expect that its assessment regarding unrecognized tax will materially change over the next twelve months. However, the Fund's conclusion may be subject to review and adjustment at a later date based on factors including, but not limited to, questioning the timing and amount of deductions, the nexus of income among various tax jurisdictions, compliance with U.S. federal, U.S. state and foreign tax laws, and changes in the administrative practices and precedents of the relevant taxing authorities.

At December 31, 2015, 2016 and 2017 the Fund recorded a liability for unrecognized tax benefits of $0 respectively related to its tax positions.

The Fund has determined that it is reasonably possible that the total amount of the unrecognized tax benefits will not increase within the next 12 months as a result of the losses sustained over the past few years.

The Fund has determined that it is reasonably possible that the total amount of the unrecognized tax benefits will remain the same within the next 12 months as a result of the losses sustained over the past few years.

Until formal resolutions are reached between the Fund and tax authorities, the amount of a possible ultimate settlement with respect to the effect on unrecognized tax benefits is not readily determinable.

The Fund does not expect that its assessment related to unrecognized tax benefits will materially change over the next 12 months.  However, the Fund's conclusions may be subject to review and adjustment at a later date based on factors including, but not limited to, the nexus of income among various tax jurisdictions; compliance with US federal, US state, and foreign tax laws; and changes in the administrative practices and precedents of the relevant taxing authorities.

The Fund recognizes interest and penalties related to unrecognized tax benefits in interest expense and other expenses, respectively.  During the year ended December 31, 2016, and December 31, 2017 the Fund recognized $0, respectively, related to interest and penalties.

## 2.  ASSETS

**Advances.**

Cambridge entities have $2,844,345 in equity ownership non-recourse advances regardless of credit or assets on NFL Concussion Settlement claims by class members in the case of *In Re: National Football League Players' Concussion Injury Litigation*, Case No. 2:12-md-02323-AB, MDL No 2323 (E.D. Pennsylvania).  The industry standard market rate of returns on equity ownership non-recourse advances regardless of credit or assets ranges from 20% to 40%. After the departure of the consultant, upon becoming aware of the significant cash flow demands that was created, Cambridge entities sought to limit the amount of funds going into advances.  During the process of reallocating capital, on December 8, 2017, United States District Court Judge Anita B. Brody prohibited any class member and the administrator from paying any assignment and declared them void.  Since that time, the Court assigned an independent firm to negotiate a settlement amount for returns on advances. There was a settlement hearing on August 14, 2018. To the extent any of these transactions are prohibited assignments in accordance with the Court's 12/8/17 Explanation and Order, all such transactions are to become terminated and converted into loans. To the extent any of these transactions are already loan transactions with interest rates that exceed an annualized 10%, the interest rate on the loan(s) will be reduced to an annualized 10% based on a simple interest rate from the date of the payment to the Settlement Class Member or to a third-party on the Settlement Class Member's behalf and will continue until the loan is paid. Additionally, there are unallocated expenses that were incurred on behalf of the players relating to determining their eligibility for CTE funds through medical exams, travel expenses, and life insurance benefits. Time constraints have limited management's ability to determine the total amount of unallocated funds.  Currently some of these unallocated payments are accounted for as expenses and will be allocated to the recipients at a later date.   Cambridge expects to address these unallocated expenses in an interim report to be completed on March 31, 2019.

**OmniPad.**

Cambridge currently has a $177,000 investment in the start-up of the OmniPad Company, LLC, equaling 10% equity ownership. OmniPad has received one critical foundational patent for its OmniPad engineering, and is in the process of applying for additional patents, prototype development, and multiple domestic and international trademark applications.

OmniPad has an August 2018 SEC Regulation CF filing which offers 10% of their stock in exchange for a $1,070,000 total combined investment from this crowd funding offering; which in turn, values the total Company at $9,630,000. OmniPad also has received an October, 2018, 3rd party valuation, which provides an estimated valuation ranging from $10,000,000 to $200,000,000, with an 80% chance that the company is worth $20,000,000 in the fall of 2019. Balanced against this estimate are the inherent risks of developing and marketing a new product in a highly competitive marketplace.  The service of a specialist was retained to determine the viability of Cambridge's investment in Omni Pad.  The specialist deemed that the funds invested versus the associated risk should not be recorded in an amount more than the book value.  Also, there is a risk that the new subject patents and trademarks will not be granted. Consequently, OmniPad will be presented at the investment cost of $ 177,000 in the CCG Financial Statements.

One of Cambridge's principal investors Tim Howard spent a significant amount of his personal funds to protect Cambridge entities into OmniPad and has paid related costs totaling $218,116.95, in 2018-2019.

**500 East Bay Street, Jacksonville, Florida Development.**

Cambridge Capital companies entered into a contract with Choate Construction, a Georgia corporation, whose address is 8200 Roberts Drive, Suite 600, Atlanta, Georgia 30342, for the $5.5 million purchase and sale of 500 East Bay Street, Jacksonville, Florida, also known as Beckman Plaza II, condominium and hotel development, with an appraised value in use of $24.6 million.  Cambridge Companies and partners invested over $700,000 into the purchase and sale, due diligence, engineering, consultants, legal costs, and more.  Purchase and Sale Agreement and Fourth Amendment to Purchase and Sale Agreement.

Due to delays in financing and closing, Choate Construction sought another purchaser, which purchaser was Bob Ohde, a contractor that was invited by and working with Cambridge Capital companies.  Bob Ohde agreed to return the investment plus an anticipated return on investment, for a total of $1.4 million with an assignment of rights from the Cambridge Capital companies.  Cambridge Capital companies and assigns transferred their rights to Bob Ohde and his company, 500 East Bay, LLC., in February of 2018.  During the interim, Bob Ohde has purchased the property and recorded the deed. Cambridge Capital companies, filed suit in Duval County seeking injunction, declaratory relief, unjust enrichment, and promissory estoppel, and placed a Lis Pendens on the property that will have to be resolved before any financing can take place.  Copy of suit and Lis Pendens was filed.  This suit was successful

and the parties settled with a net of $395,00 in value being assigned to CCG obligations and income to be paid out over a period of over one year.

| | | |
|---|---|---|
| $180,000 | CCG Cash for Obligations | 40.00% |
| $85,000 | CCG McElroy Firm fees and costs | 18.88% |
| $55,000 | TTSM/Thamir Massraf, Engineer | 12.22% |
| $50,000 | CCG Tom Woods/Lender | 11.00% |
| $80,000 | Return on $640K invested | 17.77% |

**Automobile**

Cambridge Capital entities have a company auto (2010 Mercedes-Bens SL 550) with an net book value of $29,411.

### 3.  LIABILITIES

**Auditor Billing**

Cambridge entities has an outstanding balance of $10,000 due to Bogan Public Management upon completion of the audit. This obligation will be satisfied upon receipt of a finished product.  This is a subsequent event and is not  reflected in the financial statements.

**Mental Fitness Group and Psychometrist**

Mental Fitness Group had an outstanding NFL Concussion medical screening bill to Cambridge Capital entities for $10,000, that has been assumed by Mr. Tim Howard for the benefit of Cambridge Capital entities.  The psychometrist has an outstanding NFL Concussion medical screening bill to Cambridge Capital entities for $50,000, that also has been assumed by Mr. Tim Howard for the benefit of Cambridge Capital entities.

**American Health Imaging**

American Health Imaging had an outstanding NFL Concussion MRI medical testing bill to Cambridge Capital entities for $30,300, that has been assumed by the recipients of the service as a lien in their files.

**Martin Black**

Martin Black, attorney for Cambridge Capital entities has an outstanding legal services bill to Cambridge Capital entities for $25,312.50.

**Community Business Services**

Community Business Services has an outstanding accounting and bookkeeping service bill to Cambridge Capital entities for $10,000.

**Medical Consulting Services**

Medical Consulting Services assisted with the NFL players psychometrist and has submitted invoices for $166,500.  These amounts are the responsibilities of the players who had these evaluations.

**Loans**

**Mehta Consulting**

Mehta Consulting loan entered a loan agreement with CCG for $185,000 that has been settled and is being paid for by Mr. Tim Howard, who assumed this potential liability for CCG, as a result of being sued for the $185,000.  Mehta Consulting, LLC., a Florida Limited Liability Company, filed an action in Leon County Circuit Court, Case No. 2018 CA 000512, against Philip Timothy Howard and Howard & Associates, P.A., for $185,000 plus a distinct bonus. The case was dismissed without prejudice and the parties entered into a settlement, which is being paid by Howard & Associates, P.A.  CCG has not had to pay on this obligation.

**Estate of Harry Feinberg**

Estate of Harry Feinberg July 2017 loan to CCG  $500,000 at 25% interest, originated through Jeff Kahn and Addys Walker, who are no longer with Cambridge.  CCG has responded that it will repay this loan at optional intervals of either January of 2019 or July of 2019, depending on investment returns and liquidity.

**Ken Britt**

Ken Britt loaned $25,000 to Cambridge Capital entities and this amount has been rolled. Lender is willing to take reasonably accepted interest rate.

**Estate of Vinny Feinberg**

Estate of Vinny Feinberg July 2017 loan to CCG  $500,000 at 25% interest, originated through Jeff Kahn and Addys Walker, who are no longer with Cambridge.  CCG has responded that it will repay this loan at optional intervals of either January of 2019 or July of 2019, depending on investment returns and liquidity.

**Winifred Jones (Charlene Dunlap)**

Addys Walker, a former Partner of Cambridge, originated a loan agreement with Charlene Dunlap on behalf of CCG $40,000 at 25% interest for a 45 day period. Addys Walker is no longer with Cambridge. The funds were wired to Cambridge from Winifred Jones.  It is management's concern that Charlene Dunlap is possibly a related party to Addys Walker in some way.  Cambridge repaid the loan to Winifred Jones. No paperwork was signed by

Charlene Dunlap or Winifred Jones. The 25% interest charge for 35 business days is clearly usurious and violates section 687.146, Florida Statutes, and 18 U.S.C. section 1961(6)(B).

**Stephen Saltztein**

Steven Saltzstein October 2018 loan to Cambridge Capital $200,000 at 25% interest for a 45-day loan, originated through Jeff Kahn, former Partner with Cambridge, and is no longer with Cambridge.  The 25% interest charge for 45 business days is clearly usurious and violates section 687.146, Florida Statutes, and 18 U.S.C. section 1961(6)(B).  There has been no demand on Cambridge on this loan nor has mediation taken place, which is required under the loan.

**Jasminka Illich**

Jasminka Illich loan to Cambridge in August of 2017 in the amount of $520,236.22 at 25% interest for 90-day loan. The 25% interest charge for 90-day loan is clearly usurious and violates section 687.146, Florida Statutes, and 18 U.S.C. section 1961(6)(B). There has been a demand on Cambridge on this loan.  As a result, Cambridge has agreed to mediation, which is required under the loan agreement.

**Loans**

Cambridge entities have $1,444,646 in loans reflected in the financial statements for 2017. The interest rate averages 18%.  Current loans amount to a value of $1,444,646.  Loans that are in default and are in collections amount to a value of $1,444,646.  Cambridge's previous management overestimated the ability to repay these loans as a result all loans are currently due and payable.  The current administration has been in communication with its creditors and attempting to work out a long-term arrangement to repay the debt.

## 4.  CONTINGENT LIABILITIES

**BWCI**

Cambridge Capital entities is responsible for interest charge of nearly $250,000 for two months escrow of $2 million. The obligation originated with a plan to use letters of credit on the $2 million, devised by Jeff Kahn and Addys Walker, who are no longer with Cambridge.

**NFL Accounting Request**

*In Re: National Football League Players' Concussion Injury Litigation,* MDL No. 2323 (E.D. Pennsylvania).  A motion for sanctions has been filed against Cambridge entities for failure to provide accounting of class member investments in to Cambridge entities.  Court and class counsel seek verification of class member investments and amounts in Cambridge entities. Cambridge entities have been and are complying with the discovery requests.  This accounting

and audit is a part of that compliance.  Cambridge is also taking steps to both protect the investments and to deliberately liquidate investments to secure the interests of investors as soon as possible. Judge Brody has since deferred this matter to the SEC. Cambridge has no additional issues concerning Judge Brody.

Cambridge and certain other Defendants are represented by the law firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP.

## SEC Investigation

*In the Matter of Cambridge Entities*, SEC File No. FL-04126-A.  SEC is investigating every aspect of Cambridge entities and is monitoring all actions by NFL class counsel, NFL class members, reviewing any and all relevant emails and documents, and taking testimony from relevant witnesses and NFL class members.  The SEC currently has made a recommendation for action against Cambridge. However, management will meet with the SEC representatives on February 26, 2019 to discuss the appropriate remedies. Cambridge entities are being represented by the law firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP, and the law firm of Hunter, Taubman, Fischer & Li, LLC.

## Cashflow

Prior management of Cambridge Capital entities did not retain a cash reserve, with all assets going into investments, and as a consequence, liquidity is limited.

## Private Letter Ruling To IRS

Due to an administrative error by Cambridge's management, some individuals who invested their IRA's into Cambridge through a third-party administrator was recorded as a distribution even though these individuals did not receive these funds.  The PLR will be an effort to have the IRS allow these individuals IRA's to maintain their tax-exempt status.

## Income Taxes

Under the laws of the United States of America the Fund is generally not subject to income taxes. However, certain dividend income and interest income may be subject to a maximum 30% withholding income tax. Further, certain non-United States dividend income may be subject to a tax at prevailing treaty or standard withholding rates with the applicable country or local jurisdiction. The Fund is subject to income tax examinations by major taxing authorities for all tax years since its inception. The Fund is required to determine whether its tax positions are more likely than not to be sustained upon examination by the applicable taxing authority, based on the technical merits of the position. The tax benefits recognized is measured as the largest amount of benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authorities. Based on its analysis, the Fund has determined that it has not incurred any liability for unrecognized tax benefits as of December 31, 2015, 2016 and 2017. The Fund does not expect that its assessment regarding

unrecognized tax will materially change over the next twelve months. However, the Fund's conclusion may be subject to review and adjustment at a later date based on factors including, but not limited to, questioning the timing and amount of deductions, the nexus of income among various tax jurisdictions, compliance with
U.S. federal, U.S. state and foreign tax laws, and changes in the administrative practices and precedents of the relevant taxing authorities.

The Fund has determined that it is reasonably possible that the total amount of the unrecognized tax benefits will increase because the payments are expected to be received on Advances Promissory notes and Loans within the next 12 months as a result of these funds being paid. It should be noted however, that the collection of the funds has been addressed in the going concern note below.

Until formal resolutions are reached between the Fund and tax authorities, the amount of a possible ultimate settlement with respect to the effect on unrecognized tax benefits is not readily determinable.

The Fund does not expect that its assessment related to unrecognized tax benefits will materially change over the next 12 months. However, the Fund's conclusions may be subject to review and adjustment at a later date based on factors including, but not limited to, the nexus of income among various tax jurisdictions; compliance with US federal, US state, and foreign tax laws; and changes in the administrative practices and precedents of the relevant taxing authorities.

The Fund recognizes interest and penalties related to unrecognized tax benefits in interest expense and other expenses, respectively.  During the year ended December 31, 2015, 2016, and 2017 the Fund recognized $0 and $0, respectively, related to interest and penalties. At December 31, 2015, 2016 and 2017, the Fund accrued $0 and $0, respectively, for the payment of interest and penalties.

## 5.  RELATED PARTY TRANSACTIONS

### Gail Milon

Gail Milon loaned $61,300 to Cambridge Capital entities to assist in advancing Cambridge Capital entities investments.  Cambridge has repaid $1,000 of the amount borrowed.

### Lois Koons

Lois Koons invested a portion of her retirement funds into Cambridge Capital entities based on the representations of the consultant and his capacity for investment returns. Consistent with the agreement with the consultant, she initially received monthly payments of $1,500 on her investments. The monthly payment was subsequently changed to $1,200.00 upon her

request.  Ms. Koons investment is represented by $60,000 in Cambridge Capital Partners and $61,141.96 in Cambridge Capital Group Equity Options Opportunities.  There was a counter credit of $121,141.96 reflected on Cambridge Capital Advisors December 2016 bank statement confirming Ms. Koons investment.

**Tom Woods**

Tom Woods invested his retirement funds into Cambridge Capital Partners based on the representations of the consultant and his capacity for investment returns $331,877.  Cambridge's management will devote time over the next few weeks to determine the exact participation of all related parties.

**Tim Howard**

Tim Howard has loaned and invested funds.  There is $2,194,012 invested into Cambridge Capital Advisors. The amount of funds borrowed from Cambridge Capital Advisors is $1,046,430.

**Addys Walker**

Addys Walker was the President and manager of the Cambridge Capital entities from the Spring of 2017 until late January of 2018.  He and his business partner, Linda Bedell, received over $170,000 in repayment of any loans in the Fall of 2017.  There is a question regarding liabilities owed for a real estate purchase in South Georgia for a fresh water plant that he, his company and Linda Bedell, were spearheading the purchase of in the Fall of 2017.  He and his company would have received the benefits from this project and were sharing the risk.  As a result, Cambridge has and does not assume any obligation for this transaction.

**Linda Beddell**

Linda Beddell was a partner with Addys Walker in several companies.  She and her business partner, Addys Walker, received over $182,190.00 in repayment of any loans in the Fall of 2017.  The financial transactions in Capital Advisors show that she invested $133,000 through her company.  There is a question regarding liabilities owed for a real estate purchase in South Georgia for a fresh water plant she and Addys Walker and their company were spearheading the purchase of in the Fall of 2017.  She and their company would have received the benefits from this project and were sharing the risk.  As a result, Cambridge has and does not assume any obligation for this transaction.


## 6.  INVESTORS

From the inception of Cambridge Capital entities, lenders and/or investors were family and friends of CGUI and GIAT participants.  They include Tim Howard, Christopher Gunnar Howard, Tom Woods, Taeiss Mojazza, and Ankur Mehta.  The consultant and advisors sought out other markets for investments, such as loans for businesses, real estate, company

investments, and litigation investments.  They also sought out investors and/or lending sources.

Ultimately, the consultant met with Addys Walker and Linda Beddell, who were in the advance lending markets and secondary lending markets.  They were aware of NFL Concussion advances and referred potential investments and lending sources from those advances to the consultant.  The consultant found the returns and risk to be within the interests of Cambridge Capital entities, and his presentation was persuasive to the GIAT members and President given the maturity of the advance industry markets and the understood risks associated with NFL Concussion claims.

A gradual and limited investment effort into advances was understood to be one limited direction Cambridge Capital group would pursue.  Over 200 retired NFL Concussion clients would go through the other side of the office building for preliminary CTE background testing.  After testing, the retired NFL Concussion clients would go through the building and a limited few that knew Addys Walker, Linda Beddell, or happened to talk with the consultant, would discuss investments with the consultant.  The consultant would communicate in person, over the phone and through emails and make investment recommendations.  He would provide personal service and attention in his correspondence and phone calls with the retired NFL Concussion clients and discuss options for them.  He was required to disclose his history, the risks associated with the investments, and the types of investments that were taking place.  If they were a client of Howard & Associates, a full ethics and liability disclosure and waiver was required to be reviewed by the client, their independent attorney, and signed by the client. The retired NFL Clients that determined to invest from his recommendations, would also refer other investors to the consultant.  Out of the hundreds that went through the offices for testing, over a period of 12 months, this resulted in a small number of investors, totaling 33 into Cambridge Capital entities.  With a total dollar amount of $7,982,083.

## 7.  TRANSFERS IN/OUT

Funds on occasion are moved from one company to the other to facilitate the day to day operation of the company. Transfers In/Out balance as of December 31, 2015, 2016, and 2017 are a net transfer in balance of $210,895, $767,602 and $2,480,137 for Cambridge Capital Partners and a net transfer in balance for Cambridge Equity Options of $0, $866,399 and $96,443 respectively. Additionally, funds were transferred between the Cambridge Capital Advisors transferred funds between its four bank accounts the amounts for December 31, 2015, 2016 and 2017 in the amount of $ 10,250, $30,762 and $212,549 respectively.   Management has determined that the majority of these transfers by the contract employee who was arrested and terminated on an unrelated matter did so unnecessarily.  This action appears to be a method used to divert company funds for person use.

## 8.  INTEREST EXPENSE

The interest expense represents funds paid to two investors who divested in Cambridge Entities. Additionally, interest expense on outstanding loans has been accrued and recorded at an 18% interest rate.

### 9.  UNAUTHORIZED USE OF FUNDS

Cambridge management reviewed the transactions processed by its original contractual consultant Don Reinhard and has preliminary determined that net amount of $504,166 was taken in an unauthorized manner.  Cambridge managements has determined that a Mercedes and a golf cart in excess of $50,000 was purchased with these funds.

### 10. CAPITAL SHARE TRANSACTIONS

As of December 31, 2015, 2016, 2017 there aren't any shares associated with Cambridge Advisors in that the Corporation is a single member LLC.  The financial statements for each fund are provided in separate reports and should be read in conjunction with the Fund's financial statements.

### 11. GOING CONCERN

Cambridge Capital entities are committed to making investors and lenders whole. Cambridge Capital entities are also committed to maximizing the returns for investors and lenders. The extent and ability to recover on advances and promissory notes, and the amounts and interest permitted by the courts, will have a direct effect on Cambridge Capital entities ability to fulfill its commitments.